[L.A. Nos. 30432-30436. June 1, 1976.]

*THE PEOPLE ex rel. JOSEPH P. BUSCH,
as District Attorney, etc.,
et al., Plaintiffs and Appellants, v.
PROJECTION ROOM THEATER et al., Defendants and Respondents.

(And 4 other cases.)†

*These cases were previously entitled *Busch* v. *Projection Room Theater, etc.*
†*People* ex rel. *Busch* v. *Stan's Books* (L.A. No. 30433); *People* ex rel. *Busch* v. *Book Bin* (L.A. 30434); *People* ex rel. *Busch* v. *Jason's Adult Books* (L.A. No. 30435); *People* ex rel. *Busch* v. *Galaxy Book Store* (L.A. No. 30436).

## COUNSEL

Joseph P. Busch and John K. Van de Kamp, District Attorneys, Harry B. Sondheim, Donald J. Kaplan and Dirk L. Hudson, Deputy District Attorneys, Burt Pines, City Attorney, and Edward A. Schlotman, Deputy City Attorney, for Plaintiffs and Appellants.

Fleishman, McDaniel, Brown & Weston, Fleishman, Brown, Weston & Rohde, David M. Brown, Stephen F. Rohde, Harrison W. Hertzberg and Joshua Kaplan for Defendants and Respondents.

## OPINION

**RICHARDSON, J.**—In these consolidated cases we consider whether or not a civil action brought by law enforcement officers to restrain the exhibition of obscene books and films states a cause of action for relief under the public nuisance laws of this state. Plaintiffs, who are law enforcement officers acting on behalf of both the City and the County of Los Angeles, seek injunctive and other relief against defendants who, according to the five separate complaints filed herein, operate book stores or motion picture theaters in Los Angeles which exhibit magazines or films that are obscene under the laws of this state. While the five complaints are directed at different defendants and vary somewhat in the specifics of their allegations, the causes of action alleged in each are sufficiently similar in the facts alleged and in the charging allegations to permit us to consider them together.

For convenience we examine the pleadings in the case involving Projection Room Theater finding that our conclusions in that action are dispositive of the issues raised in all of the actions. Plaintiffs assert that defendants' operations constitute public nuisances which are subject to regulation and abatement either pursuant to the general public nuisance statutes (Civ. Code, §§ 3479, 3480; Pen. Code, §§ 370, 371), or under the Red Light Abatement Law (Pen. Code, § 11225 et seq.). Defendants dispute the contention. We will conclude that although the Red Light Abatement Law was not intended to apply to the exhibition of obscene magazines or films, nevertheless the complaint herein does state a cause of action under the general public nuisance statutes.

48

The complaint herein alleges the following facts: Defendants own or operate specified premises in Los Angeles County in which acts of "lewdness" are taking place, namely, the "past and continuing exhibition" of magazines and films "all of which are lewd and obscene under the laws of this State, and therefore did and do constitute a nuisance under the laws of this State . . . ." It is further alleged that the magazines and films so exhibited by defendants have, as their dominant theme, an "appeal to the prurient interest in sex," that they are "patently offensive because they affront contemporary community standards relating to the description or representation of sexual matters," and that they are "utterly without social value . . . ."

According to the complaint, the maintenance of these premises constitutes a public nuisance which will continue unless restrained and enjoined. Plaintiffs attached to the complaint numerous exhibits consisting of police reports summarizing the obscene nature of the magazines and films exhibited by defendants. The complaint sought multiple relief including: (1) preliminary injunction restraining defendants from conducting and maintaining the premises for the purposes described above; (2) abatement of the premises as a public nuisance under sections 11230-11231 of the Penal Code (Red Light Abatement Law); (3) permanent injunction against defendants and their agents, officers and employees from operating the premises as a public nuisance; (4) closure of the premises for one year; (5) removal and sale of the fixtures and movable property thereon used in conducting the nuisance; (6) use of the proceeds from the sale to pay fees and costs in connection with the closure; and (7) other appropriate relief.

Defendants filed general demurrers to each complaint, asserting that plaintiffs failed to state a cause of action either under the public nuisance statutes or the Red Light Abatement Law. The trial court, considering itself bound by the decision in *Harmer* v. *Tonylyn Productions, Inc.* (1972) 23 Cal.App.3d 941 [100 Cal.Rptr. 576, 50 A.L.R.3d 959], sustained the demurrers without leave to amend and entered judgments of dismissal. Plaintiffs appeal.

The scope of our inquiry herein is considerably narrowed by application of the familiar rule, acknowledged by defendants, that "a general demurrer admits the truth of all material factual allegations in the complaint" (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]), and we may accordingly assume that all

materials in question, both magazines and films, are obscene within the meaning of Penal Code section 311, as alleged.

### 1. *Public Nuisance Statutes*

We first consider whether or not the allegations of the complaint, summarized above, sufficiently describe the existence of a public nuisance and note preliminarily the substantial identity of definitions appearing in Penal Code sections 370 and 371, and Civil Code sections 3479 and 3480, taken in conjunction. ■ Section 370 of the Penal Code defines a public nuisance as "[a]*nything* which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, . . ." (Italics added.) When analyzed, section 370 reveals the following: the *proscribed act* may be anything which alternatively is injurious to health or is indecent, or offensive to the senses; the *results* of the act must interfere with the comfortable enjoyment of life or property; and *those affected* by the act may be an entire neighborhood or a considerable number of persons, and as amplified by Penal Code section 371 the extent of the annoyance or damage on the affected individuals may be unequal.

■ Is the exhibition of obscene magazines and films a form of activity which may be characterized as "indecent" or "offensive to the senses" interfering with the comfortable enjoyment of life of a "considerable number of persons" within the contemplation of Penal Code section 370? We conclude that such exhibitions may fairly be deemed such conduct, and we find convincing support for such conclusion from applicable cases in this and other jurisdictions.

In *Weis* v. *Superior Court* (1916) 30 Cal.App. 730 [159 P. 464], the Court of Appeal ruled that an attraction known as the "Sultan's Harem," conducted at the Panama-California International Exposition, constituted a public nuisance subject to abatement. This exhibition assertedly involved the "indecent and offensive" exposure to members of the public of the "naked persons and private parts thereof" of various female employees. Although such conduct also constituted the crime of indecent exposure (Pen. Code, § 311), nevertheless the *Weis* court held that "[w]here, however, the threatened acts, if committed, in addition to being an indictable offense, will constitute a public nuisance, courts of equity are vested with jurisdiction to interpose their injunctive process to

prevent injury which will result from the maintenance thereof. [Citation.]" (*Weis* at p. 732.) Furthermore, the court, quoting from Wood on Nuisances (§ 68), stated that " 'A public exhibition of any kind that tends to the corruption of morals, to a disturbance of the peace, or of the general good order and welfare of society, is a public nuisance. *Under this head are. included . . . obscene pictures,* and any and all exhibitions, the natural tendency of which is to pander to vicious . . . and disorderly members of society.' " (*Ibid.,* italics added.)

The foregoing *Weis* reasoning was approved by us more than 30 years ago in *People* v. *Lim* (1941) 18 Cal.2d 872, 879 [118 P.2d 472]. *Lim* involved the propriety of an injunction against gambling activities on the ground that they constituted a public nuisance. We upheld in *Lim* the use of the public nuisance injunctive remedy against gambling activity which, it was alleged, disturbed the public peace and corrupted public morals. In *Lim* we carefully traced the history of public nuisance actions and noted that "The courts have . . . refused to grant injunctions on behalf of the state except where the objectionable activity can be brought within the terms of the statutory definition of public nuisance." (P. 879.) Although, as we noted, such activities as gambling or usury do not fit comfortably within the above quoted statutory definition of public nuisance, in *Lim* we acknowledged that an "indecent" exhibition such as was involved in *Weis* could be enjoined despite the concurrent application of the criminal statutes, since such exhibitions if determined to be indecent are expressly declared by section 370 to be public nuisances.

■ While carefully noting that *Weis* involved live dance performances, we discern no satisfactory distinction which would justify differential treatment of the pictorial representations in obscene magazines and films on the one hand, and "live" performances on the other. The presentation of either may fairly be described as "indecent" and equally injurious to public morals.

■ Defendants have insisted that only those activities may constitute public nuisances which are offensive to the five senses of hearing, sight, touch, smell, and taste. It is claimed that public nuisance and abuse of the five senses is coextensive. Defendants in so arguing focus only upon that category of nuisances described in Penal Code section 370 and Civil Code section 3479 as conduct which is "offensive to the senses." The contention is erroneous for such reasoning completely ignores the additional language appearing in both sections which explicitly includes as an *alternative* class of public nuisance conduct "anything which is

*indecent.*" When the question is put, which of the five senses is offended by conduct that is "indecent," it becomes readily apparent both that the thesis of the argument does not fit the legislative language and that conduct offensive to a community's moral sensibilities is likewise subject to regulation under section 370. Thus, the court in *Weis, supra,* at page 733, unequivocally states that ". . . any act which is an offense against public decency, or any public exhibition which is offensive to the senses, whether of sight, sound, or smell, *or which tends to corrupt public morals* or disturb the good order and welfare of society, is a public nuisance." (Italics added.)

The trial court herein, in sustaining defendants' demurrers without leave to amend, considered itself controlled by the holding in *Harmer* v. *Tonylyn Productions, Inc., supra,* 23 Cal.App.3d 941 (hg. den.). *Harmer* is distinguishable, however, since it involved an action *by private citizens* to enjoin a particular film being shown at the premises in question. The *Harmer* court ruled that plaintiff had failed to allege the necessary special damages requisite to bringing a public nuisance action (see Civ. Code, § 3493) thus casting doubt upon his status as a litigant. In contrast, the instant action is brought *by public officials* acting on behalf of the public generally and proceeding under provisions (see Code Civ. Proc., § 731) which expressly confer standing upon them.

■ More fundamentally, however, *Harmer* fails properly to analyze the nature of the state's interests in regulating the exhibition of obscene matter. *Harmer* suggests that since "only those members of the community were exposed to the film who voluntarily chose to see it," therefore "[t]he nuisance was not one which is inflicted or imposed on the public." (*Harmer* at p. 943.) Such reasoning frequently advanced and variously stated, misses the point. The fact that obscene or other indecent exhibitions take place behind closed doors and are viewed only by those who choose to view them does not defeat the community's interest in regulating such exhibitions.

Substantially identical arguments were advanced and rejected by us recently in *People* v. *Luros* (1971) 4 Cal.3d 84 [92 Cal.Rptr. 833, 480 P.2d 633], and by the United States Supreme Court in *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49 [37 L.Ed.2d 446, 93 S.Ct. 2628]. In both *Luros* and *Paris,* the argument was made that the state had no legitimate interest in regulating the exhibition and distribution of obscene matter to consenting adults. Defendants in each case urged that *Stanley* v. *Georgia*

(1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243], was controlling on this point. *Stanley,* however, held only that private possession of obscene matter cannot constitutionally be made a crime. In *Luros,* we carefully noted the important distinction, recognized by the federal Supreme Court in *Stanley,* between commercial distribution of obscenity and the private possession thereof. We concluded that ". . . in the context of public distribution of obscenity, the balance of interests upholds the constitutionality of state regulation, even though that regulation imposes some burdens upon the exercise of constitutional rights. [¶] . . . States retain broad power to regulate obscenity and regulation of the public distribution of obscenity falls well within the broad scope of that power." (4 Cal.3d at pp. 92-93.) We reaffirm the foregoing conclusion reached by us in *Luros.*

Similarly, *Paris* (decided after *Harmer* was filed) rejected the extension of *Stanley* to situations involving consenting adults. The high court specifically addressed the *Harmer* limitation on the scope of the public interest, and "categorically disapprove[d] the theory, . . . that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only." (413 U.S. at p. 57 [37 L.Ed.2d at p. 456]; see also pp. 57-69 [37 L.Ed.2d pp. 456-464].) The court noted that "[t]he States have a long-recognized legitimate interest in regulating the use of obscene material in local commerce and in all places of public accommodation, as long as these regulations do not run afoul of specific constitutional prohibitions. [Citations.]" (*Id.,* at p. 57 [37 L.Ed.2d at p. 457].) These "legitimate interests" include "the interest of the public in the *quality* of life and the total community environment, the *tone* of commerce in the great city centers, and, possibly, the public safety itself. The Hill-Link Minority Report of the Commission on Obscenity and Pornography indicates that there is at least an arguable correlation between obscene material and crime." (Fn. omitted; *id.,* at p. 58 [37 L.Ed.2d at p. 457], italics added.) Further, "[a]lthough there is no conclusive proof of a connection between antisocial behavior and obscene material, the legislature . . . could quite reasonably determine that such a connection does or might exist." (*Id.,* at pp. 60-61 [37 L.Ed.2d at p. 459].)

Following its rejection of the argument that *Stanley* forbids state regulation of the exhibition or distribution of obscene matter, the *Paris* court very significantly observed: "Commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the adult public falls within a State's broad power to

regulate commerce and protect the public environment. The issue in this context goes beyond whether someone, or even the majority, considers the conduct depicted as 'wrong' or 'sinful.' The States have the power to make a morally neutral judgment that *public exhibition of obscene material, or commerce in such material, has a tendency to injure the* community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' 'right . . . to maintain a *decent* society.' [Citation.]" (Italics added; *Paris* at pp. 68-69 [37 L.Ed.2d at pp. 463-464].) Both *Luros* and *Paris* explain and confirm that the interests of those who voluntarily view and purchase obscene materials are not necessarily coextensive with the interests of the community at large.

Even more recently the United States Supreme Court has noted that a state's public nuisance action seeking to close a theater exhibiting obscene films constituted an effort "to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws." (Fn. omitted; *Huffman* v. *Pursue, Ltd.* (1975) 420 U.S. 592, 605 [43 L.Ed.2d 482, 492, 95 S.Ct. 1200].)

Thus, the *Paris* court has clearly held that states may constitutionally determine that public exhibition of obscene material has a tendency to injure the community or to jeopardize the maintenance of a decent society. In *Luros* we confirmed the validity of state regulation of the commercial distribution of obscene materials. The legislative definition of a public nuisance includes "[a]nything which is . . . indecent, or offensive to the senses, . . . so as to interfere with the comfortable enjoyment of life or property by a . . . community or neighborhood, or . . . any considerable number of persons . . . ." (Pen. Code, § 370.) California's public nuisance definition, including as it does indecency, comports fully with the state's power to regulate as recently declared both by the federal Supreme Court and by ourselves and fortifies our conclusion that public nuisance laws may properly be employed to regulate the exhibition of obscene material to "consenting adults."

Given the legitimate state interests in controlling the exhibition of obscenity, carefully outlined in *Paris,* it is not surprising that a wide variety of cases, both before and after *Paris,* have confirmed that such exhibitions constitute nuisances which properly may be abated by the courts. (*Grove Press, Inc.* v. *Flask* (N.D.Ohio 1970) 326 F.Supp. 574, vacated and remanded on other grounds, 413 U.S. 902 [37 L.Ed.2d 1013,

93 S.Ct. 3026]; *Bloss* v. *Paris Township* (1968) 380 Mich. 466 [157 N.W.2d 260, 261]; *Cactus Corporation* v. *State* ex rel. *Murphy* (1971) 14 Ariz.App. 38 [480 P.2d 375]; *Evans Theatre Corporation* v. *Slaton* (1971) 227 Ga. 377 [180 S.E.2d 712], cert. den., 404 U.S. 950 [30 L.Ed.2d 267, 92 S.Ct. 281]; *New Rivieria Arts Theatre* v. *State* (1967) 219 Tenn. 652 [412 S.W.2d 890, 893-895]; *Sanders* v. *State* (1974) 231 Ga. 608 [203 S.E.2d 153, 156-157]; *State* ex rel. *Ewing* v. *"Without A Stitch"* (1974) 37 Ohio St.2d 95 [66 Ohio Ops.2d 223, 307 N.E.2d 911], app. dism., 421 U.S. 923 [44 L.Ed.2d 82, 95 S.Ct. 1649]; *State* ex rel. *Keating* v. *Vixen* (1971) 27 Ohio St.2d 278 [56 Ohio Ops.2d 165, 272 N.E.2d 137], vacated and remanded on other grounds, 413 U.S. 905 [37 L.Ed.2d 1016, 93 S.Ct. 3033], opn. on remand, 35 Ohio St.2d 215 [64 Ohio Ops.2d 366, 301 N.E.2d 880]; *State* ex rel. *Little Beaver Theatre, Inc.* v. *Tobin* (Fla.App. 1972) 258 So.2d 30, 31-32; *State* v. *Morley* (1957) 63 N.M. 267 [317 P.2d 317, 318-319]; see generally, Note (1975) 10 U.S.F. L.Rev. 115).

Each of the above cases either expressly or implicitly recognizes that the exhibition of obscene magazines or films constitutes a public nuisance properly subject to abatement. For example, the Georgia Supreme Court in *Evans* upheld application of a general public nuisance statute to an allegedly obscene film, "I Am Curious (Yellow)." The court explained that "[i]f any semblance of civilization is retained in our country, the States must have standards of conduct permissible in public. There is little difference in the effect on the public between lewd conduct in public areas and lewd conduct explicitly performed on a motion picture screen for the viewing of the public. . . . The exhibition of an obscene motion picture is a crime involving the welfare of the public at large, since it is contrary to the standards of decency and propriety of the community as a whole. The welfare of the whole community is served by restraining the showing of such an obscene film." (180 S.E.2d at pp. 715-716.)

*Evans* was cited and discussed with approval in *Paris, supra,* 413 U.S. 49, 54-55 [37 L.Ed.2d 446, 454-456], wherein the court *expressly approved* use of public nuisance actions to enjoin the exhibition of obscene materials. Since this portion of *Paris* is critical to our analysis, we quote it in its entirety:

"Georgia case law permits a civil injunction of the exhibition of obscene materials. [Citations, including *Evans, supra.*] While this procedure is civil in nature, and does not directly involve the state criminal statute proscribing exhibition of obscene material, the Georgia case law

permitting civil injunction does adopt the definition of 'obscene materials' used by the criminal statute. Today, in *Miller* v. *California, supra,* we have sought to clarify the constitutional definition of obscene material subject to regulations by the States, and we vacate and remand this case for reconsideration in light of *Miller.*

*"This is not to be read as disapproval of the Georgia civil procedure employed in this case,* assuming the use of a constitutionally acceptable standard for determining what is unprotected by the First Amendment. *On the contrary,* such a procedure provides an exhibitor or purveyor of materials the best possible notice, prior to any criminal indictments, as to whether the materials are unprotected by the First Amendment and subject to state regulation. [Citation.] Here, Georgia imposed no restraint on the exhibition of the films involved in this case until after a full adversary proceeding and a final judicial determination by the Georgia Supreme Court that the materials were constitutionally unprotected. Thus the standards of [prior United States Supreme Court decisions] were met." (Italics added; *Paris* at pp. 54-55 [37 L.Ed.2d at pp. 454-456].)

 Similarly, as we explain hereinafter, the California public nuisance statutes must be enforced in such a way as to operate in a constitutional fashion. So applied, as the foregoing cases make clear, there is no overriding principle of law which precludes the states from regulating the exhibition of obscene matter by application of their public nuisance statutes. To this extent, *Harmer* v. *Tonylyn Productions, Inc., supra,* 23 Cal.App.3d 941, is disapproved.

 We do not suggest, of course, that law enforcement officers in each city and county in this state have a mandatory duty always and everywhere to abate the exhibition of obscene matter within their borders. The particular nature of the exhibition, and its effect upon the community, may vary considerably in time and place. Law enforcement officers accordingly are vested with wide discretion to decide whether or not to initiate the kind of formal abatement proceedings such as those instituted in the matters before us. (See Code Civ. Proc., § 731.) Once a community through its public officials has determined that a particular display of obscene materials amounts to a public nuisance which is injurious to the safety and morals of that community, no valid reason exists why, adequate constitutional procedural safeguards being met, the remedy of civil abatement proceedings must be denied such community. The availability of the public nuisance procedure may prove useful for those local entities which, determining that they are confronted with

commercial exploitation of obscene materials resulting in the conditions contemplated in section 370, elect to use it.

We consider and will reject several constitutional objections raised by defendants.

■ Defendants first suggest that the statutory language "indecent, or offensive to the senses" (Pen. Code, § 370) is impermissibly vague, requiring them to guess as to its meaning, and thus is violative of the First Amendment to the federal Constitution. Several cases involving similar language have avoided the constitutional problem by construing such language as synonymous with the word "obscene," as defined in the applicable statutes and case law. (See *In re Giannini* (1968) 69 Cal.2d 563, 571, fn. 4 [72 Cal.Rptr. 655, 446 P.2d 535] ["lewd or dissolute conduct"]; *Silva v. Municipal Court* (1974) 40 Cal.App.3d 733, 736-737 [115 Cal.Rptr. 479] [same]; *Grove Press, Inc. v. Flask, supra,* 326 F.Supp. 574, 578 ["lewd, indecent, lascivious or obscene"]; *Janus Films, Inc. v. City of Fort Worth* (Tex.Civ.App. 1962) 354 S.W.2d 597, 600 ["indecent"]; *State* ex rel. *Ewing v. "Without A Stitch," supra,* 307 N.E.2d 911, 914-915 ["obscene" construed in light of recent United States Supreme Court opinions].)

Furthermore, the United States Supreme Court recently emphasized within the foregoing context that courts have an obligation to construe statutes in such a way as to avoid serious constitutional doubts. "If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' *'indecent,'* or 'immoral' as used to describe regulated material [in federal statutes], we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller* v. *California* . . . ." (Italics added; *United States* v. *12 200-Ft. Reels of Film* (1973) 413 U.S. 123, 130, fn. 7 [37 L.Ed.2d 500, 507, 93 S.Ct. 2665]; accord, *Hamling* v. *United States* (1974) 418 U.S. 87, 114 [41 L.Ed.2d 590, 618-619, 94 S.Ct. 2887].) Indeed, in *Bloom* v. *Municipal Court* (1976) 16 Cal.3d 71, 81 [127 Cal.Rptr. 317, 545 P.2d 229], we have construed our own obscenity statute (Pen. Code, § 311, subd. (a) ["obscene matter"]) as referring to the patently offensive matter set forth in *Miller, supra,* and have rejected the contention that the statute is unconstitutionally vague. (Accord, *People* v. *Enskat* (1973) 33 Cal.App.3d 900 [109 Cal.Rptr. 433].) We find no impediment to use of the remedy on grounds of statutory vagueness.

■ Defendants next assert that use of the public nuisance statutes to enjoin or otherwise abate the exhibition of films or magazines violates the constitutional principle against prior restraint of presumptively protected materials. (See *Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 558 [43 L.Ed.2d 448, 459, 95 S.Ct. 1239]; *United States* v. *Thirty-seven Photographs* (1971) 402 U.S. 363, 367 [28 L.Ed.2d 822, 828, 91 S.Ct. 1400]; *Freedman* v. *Maryland* (1965) 380 U.S. 51, 58 [13 L.Ed.2d 649, 654, 85 S.Ct. 734]; *Kingslley Books, Inc.* v. *Brown* (1957) 354 U.S. 436 [1 L.Ed.2d 1469, 77 S.Ct. 1325].) ■ We note preliminarily that, as the foregoing cases make clear, prior restraints are not unconstitutional per se; a prior restraint may avoid constitutional infirmity if it occurs " 'under procedural safeguards designed to obviate the dangers of a censorship system.' " (*Southeastern Promotions, Ltd., supra,* at p. 559 [43 L.Ed.2d at p. 460].) Among other safeguards, "a prompt final judicial determination must be assured." (*Id.,* at p. 560 [43 L.Ed.2d at p. 460].)

■ In order properly to evaluate defendants' prior restraint contention, we first review the possible forms of relief available to plaintiffs in an ordinary public nuisance action. The public nuisance statutes, unlike the Red Light Abatement Law, do not provide for such specific forms of relief as temporary and perpetual injunction (Pen. Code, §§ 11226-11227), removal and sale of fixtures, and closure of the premises for one year (Pen. Code, § 11230). Instead, the district attorney or city attorney is, in general terms, empowered to bring a civil action to "abate" the public nuisance. (Code Civ. Proc., § 731.) Further, " 'An abatement of a nuisance is accomplished in a court of equity by means of an injunction *proper and suitable* to the facts of each case. . . .' " (Italics added; *Guttinger* v. *Calaveras Cement Co.* (1951) 105 Cal.App.2d 382, 390 [233 P.2d 914]; see generally McQuillin, Municipal Corporations, § 24.73.)

Thus, in the matters before us if the trial court finds the subject matter obscene under prevailing law an injunctive order may be fashioned that is "proper and suitable" in each case. It is entirely permissible from a constitutional standpoint to enjoin further exhibition of specific magazines or films which have been finally adjudged to be obscene following a full adversary hearing. (*Paris Adult Theatre I* v. *Slaton, supra,* 413 U.S. 49, 54-55 [37 L.Ed.2d 446, 454-456] [approving Georgia abatement procedure]; *Grove Press, Inc.* v. *Flask, supra,* 326 F.Supp. 574, 579; *New Rivieria Arts Theatre* v. *State, supra,* 412 S.W.2d 890, 893-895; *State* ex rel. *Ewing* v. *"Without A Stitch," supra,* 307 N.E.2d 911, 914; *State* ex rel. *Little Beaver Theatre, Inc.* v. *Tobin, supra,* 258 So.2d 30, 32; *State* ex rel. *Keating* v. *Vixen, supra,* 272 N.E.2d 137; see *Commonwealth* v. *Guild*

*Theatre, Inc.* (1968) 432 Pa. 378 [248 A.2d 45]; *Grove Press Inc.* v. *City of Philadelphia* (3d Cir. 1969) 418 F.2d 82, 90-91; *Sanders* v. *State, supra,* 203 S.E.2d 153, 156-157.)

In the cases at bench, in addition to relief under the Red Light Abatement Act (Pen. Code, § 11225 et seq.),[1] plaintiffs seek a preliminary injunction enjoining and restraining defendants "from conducting and maintaining said premises hereinabove described . . . for the purposes of lewdness and from permitting such acts to take place therein and thereon . . . [and further pray that they] be perpetually enjoined from operating and conducting said premises as a public nuisance." Both in their briefs and at oral argument plaintiffs have made abundantly clear that, as the prayers of their complaints state, the relief they seek is the abatement and closing down of movie theaters and bookstores exhibiting and selling films and magazines determined to be obscene. Although we have concluded upon well recognized principles of pleading that plaintiffs' complaints state actionable causes for the enjoining of the exhibition and sale of specific obscene materials, we are satisfied that to grant the relief sought by plaintiffs (i.e., closing down the premises in question) would result in a full and pervasive prior restraint upon the freedom of speech and of the press in violation of the First and Fourteenth Amendments to the United States Constitution. (See *Near* v. *Minnesota* (1931) 283 U.S. 697, 711-715, 720 [75 L.Ed. 1357, 1365-1367, 1369, 51 S.Ct. 625]; *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70-71 [9 L.Ed.2d 584, 593-594, 83 S.Ct. 631]; *Freedman* v. *Maryland, supra,* 380 U.S. 51, 57 [13 L.Ed.2d 649, 653-654]; *Carroll* v. *Princess Anne* (1968) 393 U.S. 175, 180-181 [21 L.Ed.2d 325, 330-331, 89 S.Ct. 347]; see and compare *Kingsley Books, Inc.* v. *Brown, supra,* 354 U.S. 436; see also *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 664-665 [97 Cal.Rptr. 320, 488 P.2d 648]; *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981, 985-990, passim [59 Cal.Rptr. 872, 429 P.2d 192].) The courts of a number of our sister states have similarly held that such prior restraints as here sought by plaintiffs are constitutionally impermissible. (See *General Corporation* v. *State* ex rel. *Sweeton* (Ala. 1975) 320 So.2d 668, 675 (plurality opn.); *Gulf States Theatres of La., Inc.* v. *Richardson* (La. 1973) 287 So.2d 480, 489; *Mitchem* v. *State* ex rel. *Schaub* (Fla. 1971) 250 So.2d 883, 886-887; *New Rivieria Arts Theatre* v. *State, supra,* 412 S.W.2d 890, 893-895; *Sanders* v. *State, supra,* 203 S.E.2d 153, 156-157; *State* ex rel. *Little Beaver Theatre, Inc.* v. *Tobin, supra,* 258 So.2d 30, 32; *State* ex rel. *Ewing* v. *"Without A Stitch," supra,* 307 N.E.2d 911, 917-918; but see

---

[1]As we explain *infra,* this enactment is inapplicable to any of the cases before us.

*People* ex rel. *Hicks* v. *Sarong Gals* (1974) 42 Cal.App.3d 556, 562-563 [117 Cal.Rptr. 24]; *Bloss* v. *Paris Township, supra,* 157 N.W.2d 260; *Grove Press, Inc.* v. *Flask, supra,* 326 F.Supp. 574, 578-580; *United Theaters of Fla., Inc.* v. *State* ex rel. *Gerstein* (Fla.App. 1972) 259 So.2d 210, 212-213, vacated and remanded 419 U.S. 1028 [42 L.Ed.2d 304, 95 S.Ct. 510].)

Thus, in *Sanders,* the Georgia Supreme Court pointed out that "One obscene book on the premises of a book store does not make an entire store obscene. The injunction closing this store and padlocking it as a public nuisance necessarily halted the future sale and distribution of other printed material which may not be obscene, thereby precluding the application of the above procedural safeguards [prior notice and a prompt judicial hearing] and creating an unconstitutional restraint upon appellant. This broad result cannot be reconciled with free expression under our Constitutions." (P. 157.)

We are aware of no reported cases authorizing the closing of a bookstore or theater, even after it has been repeatedly determined judicially in a full adversary hearing that all or substantially all of the magazines or films exhibited or sold therein are obscene. Indeed plaintiffs have directed our attention to no such precedents, have presented nothing to countermand or distinguish the authorities referred to above, and at oral argument stated they could find no authority justifying the closing of bookstores in such circumstances. While we have concluded that a court of equity, having determined particular magazines or films to be obscene, after a full adversary hearing, may enjoin the exhibition or sale thereof by those responsible, we emphasize that the closing of such bookstores or theaters, either temporarily or permanently, or the enjoining of the exhibition or sale on said premises of magazines or films not specifically so determined to be obscene, constitutes an impermissible prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution.

We therefore hold that abatement in the present action must be directed to particular books or films which have been adjudged obscene following a fair and full adversary hearing, rather than against the premises in which the material is sold, exhibited or displayed.

██ Defendants finally maintain that since the public nuisance statutes are silent with respect to prior adversary hearings, this court should not undertake to "rewrite" those statutes to require such hearings.

Such a contention lacks merit. We are obliged to construe and interpret legislation in a manner which will uphold its validity. (*Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697]; *In re Kay* (1970) 1 Cal.3d 930, 941-942 [83 Cal.Rptr. 686, 464 P.2d 142].) Thus, the courts have held that provision for a prior adversary hearing may be implied by law in otherwise silent statutory provisions. (*State* ex rel. *Little Beaver Theatre, Inc.* v. *Tobin, supra,* 258 So.2d 30, 31-32; see *United States* v. *Thirty-seven Photographs, supra,* 402 U.S. 363, 367-373 [28 L.Ed.2d 822, 828-832].) As hereinabove expressed, abatement of a nuisance is accomplished by means of a "proper and suitable" injunction. In the context of assertedly obscene magazines and films, a "proper" injunction ordinarily is one that is issued after the requisite adversary hearing has taken place.

We emphasize that the proceedings now before us remain at the pleading stage. Having determined that plaintiffs' complaint is sufficient to state a cause of action based upon a general nuisance theory, we consider it inappropriate to describe in detail the precise dimensions of the injunctive and other relief which might be suitable in this and the related cases. It is enough that the parties and the trial court recognize that substantial constitutional issues are presented in this litigation, and that care must be exercised to assure that defendants' constitutional rights are not infringed. More than this is not required.

### 2. *Red Light Abatement Law*

■ As an alternative theory of relief, plaintiffs allege that defendants' exhibition of obscene magazines and films constitutes a nuisance subject to abatement under the provisions of the Red Light Abatement Law (Pen. Code, § 11225 et seq.). We have previously noted that these provisions prescribe certain specific forms of relief not available under the general nuisance statutes, including temporary injunctions, removal and sale of fixtures, and closure of the premises for one year. (Pen. Code, §§ 11227, 11230.)

The Red Light Abatement Law defines as a nuisance "[e]very building or place used for the purpose of illegal gambling as defined by state law or local ordinance, *lewdness,* assignation, or prostitution . . . ." (Italics added.) Defendants maintain that the term "lewdness" does not include the exhibition of obscene magazines or films in bookstores or theaters. We agree.

The law was passed in 1913 and, as its name indicates, its primary purpose was to regulate ". . . houses of ill fame, . . . and other like places, where acts of lewdness and prostitution are habitually practiced and carried on as a business." (*People* v. *Barbiere* (1917) 33 Cal.App. 770, 775 [166 P. 812].) It has been held that the terms "lewdness, assignation, or prostitution" were "obviously" intended to refer to "illicit sexual acts or conduct amounting to or involving lewdness." (*People* v. *Arcega* (1920) 49 Cal.App. 239, 242 [193 P. 264].) The term "lewdness" is not synonymous with "prostitution" and has a broader significance, including "all other immoral or degenerate conduct or conversation between persons of opposite sexes, . . ." including the solicitation of sexual acts to be performed elsewhere. (*People* v. *Bayside Land Co.* (1920) 48 Cal.App. 257, 260 [191 P. 994].)

The consensus of more recent cases is that the term "lewdness" is broad enough to include *live* lewd entertainment, such as stage shows or other exhibitions featuring obscene performances. (*People* ex rel. *Hicks* v. *Sarong Gals* (1972) 27 Cal.App.3d 46, 50 [103 Cal.Rptr. 414], subsequent opn., *supra,* 42 Cal.App.3d 556, 559; *Harmer* v. *Tonylyn Productions, Inc., supra,* 23 Cal.App.3d 941, 944; *Maita* v. *Whitmore* (N.D.Cal. 1973) 365 F.Supp. 1331.) Yet no California case has yet held that the Red Light Abatement Law was intended to apply to the exhibition of obscene magazines or films. As stated in *Harmer*: "If the Legislature had desired or intended by section 11225 of the Penal Code to regulate the showing of pornographic films, pictures or drawings, such subject matter could have been included in section 11225 when it was recently amended in 1969, as it did when it chose to enumerate 'illegal gambling as defined by state law or local ordinance' in that section of the Penal Code." (23 Cal.App.3d at p. 944.) On the other hand, it has been forcefully contended that "it borders upon the absurd to apply the law to live stage shows and exhibitions that are lewd and to deny its application to motion pictures that are patently lewd and obscene." (*Id.,* at p. 952 [dis. opn.]; see also *People* ex rel. *Hicks* v. *Sarong Gals, supra,* 27 Cal.App.3d at p. 50.)

The courts of other states have generally agreed that "red light" laws do not apply to the exhibition of obscene books or films. (*People* v. *Goldman* (1972) 7 Ill.App.3d 253 [287 N.E.2d 177]; *Gulf States Theatres of La., Inc.* v. *Richardson, supra,* 287 So.2d 480; *Southland Theatres, Inc.* v. *State* ex rel. *Tucker* (1973) 254 Ark. 192 [492 S.W.2d 421]; *State* v. *Morley, supra,* 317 P.2d 317, 318-320; *State* ex rel. *Cahalan* v. *Diversified Theat.* (1975) 59 Mich.App. 223 [229 N.W.2d 389].)

Although the question is not free from doubt, in view of the history of the Red Light Abatement Law and the uniform interpretation given it by the courts of this state, we conclude that the act's provisions were not intended to apply, and do not apply, to the exhibition of obscene magazines or films.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Wright, C. J., and Sullivan, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in that part of the majority opinion which emphasizes that the closing of bookstores or theaters, either temporarily or permanently, constitutes an impermissible prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution. I would add that such proceedings also offend article I, section 2, of the California Constitution which prohibits action that may "restrain or abridge liberty of speech or press."

Other than the foregoing, I dissent and join with Justice Tobriner in his views.

**CLARK, J.,** Concurring and Dissenting.—I concur in the judgment and the opinion of the court except insofar as the new opinion differs from the vacated opinion by substitution of the material at page 58, line 4 to page 59, line 34 in place of the following paragraph: "We express no opinion upon the further question whether the court may, in addition, either close the premises entirely or enjoin further 'obscene' exhibitions regarding materials not yet adjudged obscene. Several cases suggest that such further forms of relief would be appropriate and constitutionally permissible. (See *People* ex rel. *Hicks* v. *Sarong Gals* (1974) 42 Cal.App.3d 556, 562-563 [117 Cal.Rptr. 24]; *Bloss* v. *Paris Township* (1968) 380 Mich. 466 [157 N.W.2d 260]; *Grove Press, Inc.* v. *Flask* (N.D.Ohio 1970) 326 F.Supp. 574, 578-580; *Oregon Bookmark Corporation* v. *Schrunk* (D.Ore. 1970) 321 F.Supp. 639; *State* ex rel. *Cahalan* v. *Diversified Theat.* (1975) 59 Mich.App. 223 [229 N.W.2d 389, 396-397]; *United Theaters of Fla., Inc.* v. *State* ex rel. *Gerstein* (Fla.App. 1972) 259 So.2d 210, 212-213, vacated and remanded, 419 U.S. 1028 [42 L.Ed.2d 304, 95 S.Ct. 510].) Other cases have held that such relief would constitute an invalid prior restraint of presumptively protected materials (*Gulf States Theatres of La., Inc.* v. *Richardson* (La. 1973) 287 So.2d 480, 489; *Mitchem* v. *State* ex rel. *Schaub* (Fla. 1971) 250 So.2d 883, 886-887;

*New Riviera Arts Theatre* v. *State* (1967) 219 Tenn. 652 [412 S.W.2d 890, 893-895]; *Sanders* v. *State* (1974) 231 Ga. 608 [203 S.E.2d 153, 156-157]; *State* ex rel. *Little Beaver Theatre, Inc.* v. *Tobin* (Fla.App. 1972) 258 So.2d 30, 32; *State* ex rel. *Ewing* v. *"Without A Stitch"* (1974) 37 Ohio St.2d 95 [66 Ohio Ops.2d 223, 307 N.E.2d 911, 917-918].) Since the United States Supreme Court has not yet spoken on this difficult question, and since in this posture of the case the issue is not before us, we leave the question open for further consideration."

McComb, J., concurred.

**TOBRINER, J.,** Dissenting.—The majority today empowers city attorneys to bring actions to abate the sale or display of purportedly obscene material as a public nuisance, even when such sale or display occurs wholly within the confines of an adult bookstore or theatre and thus in no way afflicts those members of the community who would find it offensive. By permitting a city attorney who objects to certain material to wield this remedy—a remedy designed for those rare cases where any delay would concretely imperil the public interest—the majority endangers freedom of expression to an extent never before contemplated in this state. Hereafter, the public's right to read books or magazines, to view plays or motion pictures, can be permanently curtailed if a city attorney can find a *single judge* who believes the material is obscene. In light of the vagueness of the prevailing constitutional obscenity standard, and the subjective nature of the judgment that the application of that standard inevitably entails, the majority's sanction of censorship by a single judicial officer robs our free speech guarantees of their constitutionally mandated protection.

As we shall point out, however, this case may be resolved on grounds other than that the Legislature exceeded constitutional bounds when it enacted the public nuisance laws; those laws simply do not confer upon the city attorney the power that the majority today bestows upon him. As drafted by the Legislature, the public nuisance laws provide an extraordinary remedy for situations that truly demand one; it is only as rewritten by the majority that these laws trench upon constitutional rights.

Courts of equity enjoy no roving commission to define public nuisances; they may abate only such nuisances as the Legislature declares. In *People* v. *Lim* (1941) 18 Cal.2d 872, 881 [118 P.2d 472], we acknowledged that "the responsibility for establishing those standards of

public morality, the violations of which are to constitute public nuisances within the equity's jurisdiction, should be left with the Legislature."[1] Our charge, consequently, is a limited one: we must ascertain whether the Legislature has declared that the conduct complained of in the present case constitutes a public nuisance.

It has not. The public nuisance statutes do not embrace conduct whose tangible effects are limited to a small group of consenting adults. A careful reading of the statutes discloses that they govern only *public* nuisances—that is, only those nuisances that bear concretely upon the health or senses of a substantial number of people. The statutory language supports this conclusion in two ways.

First, only such indecent behavior as assaults the *senses* of the community constitutes a public nuisance. The majority bases its contrary conclusion on section 370 of the Penal Code which defines a public nuisance to be anything "which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property . . . ." The majority argues that this language recognizes four classes of conduct that may constitute a public nuisance: conduct that is (a) injurious to health; (b) indecent; (c) offensive to the senses; or (d) an obstruction to property. Since indecency is a ground for finding a public nuisance quite apart from offense to the senses, the argument goes, the statute subsumes even private indecency which has no impact upon the senses of the community as a whole.

The majority's error is fundamental: it construes the wrong statute. Although sections 370-372 of the Penal Code govern the criminal dimension of public nuisances, section 731 of the Code of Civil Procedure governs their abatement. That section provides that "[a] civil

---

[1] The judicial reluctance to proclaim new species of public nuisance is well founded. The remedy of abatement, fashioned as it was to equip the courts to deal expeditiously with serious perils to the public, denies the defendant many of the procedural safeguards he would enjoy if he were subjected to an ordinary civil or criminal action. "[I]t is apparent that the equitable remedy has the collateral effect of depriving a defendant of the jury trial to which he would be entitled in a criminal prosecution for violating exactly the same standards of public policy. The defendant also loses the protection of the higher burden of proof required in criminal prosecutions and, after imprisonment and fine for violation of the equity injunction, may be subjected under the criminal law to similar punishment for the same acts. For these reasons equity is loath to interfere where the standards of public policy can be enforced by resort to the criminal law, and in the absence of a legislative declaration to that effect, the courts should not broaden the field in which injunctions against criminal activity will be granted." (*People* v. *Lim, supra,* 18 Cal.2d 872, 880 (citations omitted).)

action may be brought . . . to abate a public nuisance, *as the same is defined in section thirty-four hundred and eighty of the Civil Code . . . .*" (Italics added.) Although the majority alludes to the "substantial identity" of the Penal Code and Civil Code definitions, I find them different in one pivotal respect.

Since section 3480 of the Civil Code merely provides that "a public nuisance is one which affects at the same time . . . any considerable number of persons," we must refer to the definition of nuisance set forth in the preceding section. Section 3479 of the Civil Code defines a nuisance to be anything "which is injurious to health, *or is indecent or offensive to the senses,* or an obstruction of the free use of property . . . ." (Italics added.) The difference between this definition and that contained in the Penal Code is subtle, but crucial. The phrase "to the senses" in section 370 of the Penal Code modifies only the word "offensive"; here, it modifies *both indecent and offensive.* According to the Civil Code, therefore, indecent conduct is a public nuisance *only when it is "indecent . . . to the senses"* of a substantial number of people. Consequently, a court may not abate a public nuisance unless it assaults the senses, not merely the sensibilities or tastes, of the community.[2]

That the private sale or display of obscene material may not be abated as a public nuisance is thus manifest. Such materials do not impact "at the same time" on the *senses* of a "considerable number of people." (Civ. Code, § 3480.) The result would be different if the purportedly obscene

---

[2]This argument, admittedly, lets a great deal turn on the absence of a comma in Civil Code section 3479, but the majority lets an equal amount turn on the presence of a comma in section 370 of the Penal Code. Since the statute authorizing the *abatement* of nuisances explicitly refers to the Civil Code definitions, there can be no doubt that we are to construe the section that lacks the comma. It is quite likely, of course, that this difference in punctuation between the two sections is accidental, and that their drafters intended their scope to be coextensive. This court, consequently, might reasonably decide to interpret the sections identically, notwithstanding their different punctuation.

Which section, however, contains the error and which section is correct? It is difficult to ascertain the intent that motivated the Legislature when it enacted these statutes in 1872 and amended them in 1874; any conclusion that one rather than the other involved the error in punctuation, therefore, is fraught with uncertainty. Nonetheless, if we must choose which section is correct, we should honor the definition·embodied in the Civil Code. The fact that section 731 of the Code of Civil Procedure refers to the Civil Code definitions gives some indication that those definitions comport with the Legislature's· wishes. Moreover, the preferences for narrowly construing statutes that infringe first amendment values and for interpreting statutes.in light of the consequences of the alternative constructions, see *infra,* conjoin to urge that we embrace the Civil Code definitions. These considerations, I grant, do not conclusively establish that the Civil Code definition accurately reflects the legislative intent; there are no reasons, however, to prefer the definition contained in the Penal Code.

materials were flaunted on a public billboard. In that event, the indecent behavior or object would simultaneously affect the senses of a large group. But where the purportedly indecent behavior occurs in private, the mere fact that even a large portion of the public disapproves of it fails to bring it within the purview of the public nuisance abatement statute.[3]

The public nuisance statutes do not comprehend the private sale or display of obscenity for yet a second reason. The requirement that a public nuisance "interfere with the comfortable enjoyment of life or property" (Civ. Code, § 3479; Pen. Code, § 370) effectively excludes private behavior from the purview of the public nuisance statutes. In the present case, for example, the purportedly obscene exhibitions themselves in no way interfere with the comfortable enjoyment of life of those who do not enter the adult book stores or theatres; the materials do not obtrude upon those who never see them. Consequently, the necessity that the nuisance interfere with the comfortable enjoyment of life infuses both the Penal and Civil Codes with the requirement of *public* behavior that the phrase "indecent . . . to the senses" independently imports to the latter.

It might be argued that although the obscene materials themselves do not affect the lives of those who do not view them, the knowledge that there are stores or theatres that sell or display such materials does interfere with the comfortable enjoyment of life of a considerable number of people. So attenuated a discomfort, however, is far too meager to command the protection of the public nuisance statutes. There is no hint in the statutes or the cases construing them that conduct can constitute a public nuisance simply because some people stand philosophically opposed to it; the courts have demanded that conduct impinge more concretely upon a substantial number of people before branding it a public nuisance.

In *People* v. *Robin* (1943) 56 Cal.App.2d 885, 889 [133 P.2d 436], the court held that "the unlawful sale of liquor, of itself, . . . does not constitute a nuisance within the terms of section 3479, Civil Code . . . ."

---

[3]The majority insists that conduct that is indecent does not offend any of the five senses, and thus that the use of the word "indecent" in the statute establishes that the public nuisance laws encompass conduct that does not bear upon the senses. (*Ante*, at p. 50.) The answer is simple: even though conduct that is indecent does its damage to the sensibilities or tastes, rather than the senses, of the public, it falls within the public nuisance statute only when perceived by the senses of a substantial number of people.

Since violating the laws regulating the sale of liquor is presumably as indecent as violating the laws regulating the sale of obscene material, the court implicitly ruled that the mere fact that certain behavior runs afoul of society's preferences—even as articulated in its criminal laws—constitutes an inadequate basis for holding it a public nuisance.

In *People* v. *Seccombe* (1930) 103 Cal.App. 306 [284 P. 725], the court declined to abate the practice of usury as a public nuisance. It observed: "It is very evident that if following the despicable calling of usurer constitutes a public nuisance [as defined in Civil Code section 3479] it must be because such conduct constitutes 'an obstruction to the free use of property'. . . . *It could not by any stretch of the imagination be considered as covered by any other clause of the code definition.*" (103 Cal.App. at p. 310.) (Italics added.) The court's language left scant doubt that it thought that engaging in "the despicable calling of usurer" smacked of indecency. Nonetheless, it expressly ruled that that practice could not qualify as a nuisance on the grounds that it was indecent or offensive to the senses of a large number of people.

In *Dean* v. *Powell Undertaking Co.* (1921) 55 Cal.App. 545 [203 P. 1015], the court refused to abate the operation of a funeral parlor in a residential neighborhood as a public nuisance. The plaintiffs had complained that the operation of such an establishment precluded the comfortable enjoyment of life for many residents who were squeamish about the proximity of dead bodies. The court explained that the plaintiffs deserved relief only if they could establish that the funeral parlor emitted noxious odors or otherwise afflicted the senses of the aggrieved parties, and that merely offending the sensibilities of some people would not render it a public nuisance. The *Dean* court quoted with approval the language of the New Jersey Court of Chancery in *Wescott* v. *Middleton* (1887) 43 N.J. Eq. 478, 486 [11 A. 490]: "In this case, then, we have the broad, yet perfectly perceptible or tangible ground or principle announced that the injury must be physical as distinguished from one purely imaginative; it must be something that produces real discomfort or annoyance through the medium of the senses, not from delicacy of taste or refined fancy. . . ."

The Court of Appeal most recently addressed this issue in *Harmer* v. *Tonylyn Productions Inc.* (1972) 23 Cal.App.3d 941 [100 Cal.Rptr. 576, 50 A.L.R.3d 959], in which private citizens brought an action pursuant to section 3493 of the Civil Code to enjoin the showing of a purportedly obscene film as a public nuisance. As the majority notes, *Harmer* ruled

that the plaintiffs had not alleged the special damages that section 3493 requires of private citizens who would bring an action to abate a public nuisance. In so holding, however, the court explicitly rejected the contention that the statutory language embraced such a private exhibition.

The *Harmer* court observed: "The film involved was shown only in a closed theatre. . . . Thus, only those members of the community were exposed to the film who voluntarily chose to see it. This is not a case where the community as a whole is forced to submit involuntarily to vile odors or air pollution or to the unwelcome presence of animals. In the statute's terms, the alleged nuisance at bench did not '. . . affect[s] *at the same time* an *entire* community or neighborhood, . . .' (Civ. Code, § 3480) (italics added)." (Citations omitted.) The court thus squarely rejected the notion that the mere existence of an establishment that deals in obscene materials constitutes a public nuisance, for if private indecent behavior fell within the public nuisance statute, the entire community *would have been affected* in *Harmer.*

The majority contends that *Harmer* improperly analyzed the character of the state interest in regulating the exhibition of obscene matter; it observes that *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49 [37 L.Ed.2d 446, 93 S.Ct. 2628] and *People* v. *Luros* (1971) 4 Cal.3d 84 [92 Cal.Rptr. 833, 480 P.2d 633], both recognize a legitimate state interest in regulating the distribution of obscene material to consenting adults. But those decisions merely testify to the outer limits of constitutional state regulation; they do not testify to the actual ambit of California's public nuisance laws. *Harmer* correctly construed the California statutes. The majority cannot rebut that construction by merely noting that, under prevailing constitutional doctrine, the Legislature stands *empowered* to draft more expansive statutes.

In support of its conclusion that the public nuisance statute comprehend private indecent behavior, the majority relies primarily upon *Weis* v. *Superior Court* (1916) 30 Cal.App. 730 [159 P. 464], which involved the indecent exposure of women in an exhibit at the 1915 Panama-California International Exposition. In a three-and-one-half-page opinion the court ruled that it could abate the exhibition as a public nuisance in order to subserve the public morals and protect "men, women, and children attending *this public resort as spectators from being subjected to* witnessing the offensive and indecent exhibition." (30 Cal.App. at p. 733.)

*Weis* constitutes meager support for the expansion of the public nuisance statutes that the majority today effects. It is not at all clear that spectators were adequately forewarned of the character of the exhibition involved in *Weis*. Although the exhibition's name might have given some hint of its nature, spectators could reasonably have assumed that the "Sultan's Harem" involved something less than actual nudity. Nor is there any indication that the manager of the exhibit attempted to convey its content to possible spectators by making it an "adults only" attraction; the court explicitly referred to the need to protect children from the exhibition. To the extent that *Weis* involved subjecting an unadmonished audience to indecent material, it has no bearing on the present case in which the allegedly indecent material was displayed exclusively within the confines of an "adults only" establishment.

The majority also attempts to cull support from *People* v. *Lim, supra,* 18 Cal.2d 872, which, it maintains, "approves the reasoning" of *Weis*. (*Ante,* at p. 50.) As noted above, however, it is not at all clear that the reasoning or the holding of *Weis* extends to truly private conduct. *Lim* itself did not involve indecency or obscenity, but a gambling establishment which, the complaint alleged, " 'draws together great numbers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, creates traffic and fire hazards, and is thereby injurious to health, indecent and offensive to the senses and impairs the free enjoyment of life and property.' " We held simply that "[c]rowds of disorderly people who disturb the peace and obstruct the traffic may well impair the free enjoyment of life and property and give rise to the hazards designated in the statute." (18 Cal.2d at p. 882.) Needless to say, the concrete interference with the public peace in *Lim* is quite distinct from the private behavior involved in the present case.

A careful study of the statutes and the cases thus impels the conclusion that the public nuisance statutes do not govern indecent conduct when such conduct is not thrust upon those who find it repugnant. The potent remedy of abatement is reserved for objects and behavior that concretely interfere with the enjoyment of life of a considerable number of people; to the extent that private indecent behavior offends the sensibilities of members of the community, they must rely on their public officials to enforce any apposite criminal laws.

Recent expressions of legislative and popular will reinforce my conclusion that the public nuisance statutes do no⁺ govern private conduct. As explained above, *Harmer* v. *Tonylyn Productions, Inc., supra,* 23 Cal.App.3d 941, ruled that California's public nuisance statutes did not embrace the sale or display of obscene material under circumstances in which such materials are exposed only to willing viewers. Following *Harmer,* several attempts were made legislatively to overrule the decision; the voters and legislators of this state rebuffed each attempt to establish public nuisance abatement procedures directed at obscenity.

In the 1972 general election, the electorate rejected by a vote of about two to one an initiative measure that would have endowed the district attorney of any county with the authority to maintain an action for an injunction in superior court to prevent the display or sale of obscene material.[4] In June 1974, the Assembly Committee on Criminal Justice

---

[4]The relevant portions of the initiative (Proposition 19) read:

"CHAPTER 7.9. INJUNCTIVE RELIEF

"313.50. The superior courts of the State of California have jurisdiction to enjoin the sale or distribution of any book, magazine, or any other publication or article, or the public showing of any motion picture film, slide, exhibit, or performance which is prohibited under Chapters 7.5, 7.6, 7.7 or 7.8 of this title.

"313.51. The district attorney of any county in this state in which a person, firm, or corporation sells or distributes, or is about to sell or distribute, or is about to acquire possession with intent to sell or distribute any book, magazine, pamphlet, newspaper, story paper, writing paper, picture, card, drawing, photograph, or other publication or matter which is prohibited by the above enumerated chapters may maintain an action for an injunction against such person, firm, or corporation in the superior court to prevent the sale or further sale or the distribution or further distribution of any such prohibited publication or articles.

"313.52. The district attorney of any county in this state in which a person, firm, or corporation shows publicly, or is about to show publicly, or is about to acquire possession with intent to show publicly any motion picture film, slide, exhibit, or performance which is prohibited under the above enumerated chapters may maintain an action for an injunction against such person, firm, or corporation in the superior court to prevent the public showing or further public showing of such prohibited matter or activity.

"313.53. The person, firm, or corporation sought to be enjoined is entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days after the conclusion of the trial.

"313.54. In the event that an order or judgment be entered in favor of the district attorney and against the person, firm, or corporation sought to be enjoined, such final order or judgment shall contain a provision directing the person, firm, or corporation to surrender to such peace officer as the court may direct or to the sheriff of the county in which the action was brought any of the matter described in Section 313.51 or 313.52, and such sheriff or officer shall be directed to seize and destroy the same, provided that destruction of such matter shall be stayed until after the time provided for filing a notice of appeal has expired, and provided further that where an appeal is timely filed, such destruction shall be stayed pending the decision on appeal."

Proposition 19 was defeated by a vote of 5,503,888 (67.9 percent) No to 2,603,927 (32.1 percent) Yes. Secretary of State, Statement of Vote, General Election November 7, 1972, page 30.

defeated similar provisions in Assembly Bill No. 4340.[5]

In light of the *Harmer* decision, and the subsequent rejection of proposed legislation which would have specifically authorized a nuisance abatement procedure to be used against obscenity, traditional canons of statutory construction teach that the existing nuisance provisions should not be judicially extended to encompass the display of allegedly obscene material to willing viewers. " 'Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it. [Citations.]' (*People* v. *Hallner,* 43 Cal.2d 715, 719 [277 P.2d 393]; *People* v. *Courtney,* 176 Cal.App.2d 731, 741 [1 Cal.Rptr. 789].) This rule is not rendered inapplicable by the fact that the determinative decision is rendered by a Court of Appeal." (*People* v. *Orser* (1973) 31 Cal.App.3d 528, 533-534, fn. 4 [107 Cal.Rptr. 458].)

Properly construed, the public nuisance statutes do not embrace private indecency such as involved in the present case. Our inquiry would normally end here. Given the majority's conclusion that these statutes do encompass such private behavior, however, it becomes necessary to assay them by constitutional standards. As construed by the majority, the public nuisance statutes fail to pass constitutional muster for several reasons.

---

[5]The relevant portions read:

"311.3(a) The superior court has jurisdiction to enjoin the sale, distribution or exhibition of obscene books, articles or films, as hereinafter specified:

"(1) The district attorney, county counsel, city attorney or city prosecutor of any county, city or town, in which a person, firm or corporation sells, distributes or exhibits or is about to sell, distribute or exhibit or has in his possession with intent to sell, distribute or exhibit any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, film, figure, image or any written or printed matter of an indecent character which is obscene as defined in Section 311, may maintain an action for an injunction against such person, firm or corporation in the superior court to prevent the sale or further sale or further distribution or the exhibition or further exhibition of such matter.

"(2) The person, firm or corporation sought to be enjoined shall be entitled to a trial of the issues within 14 days after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial.

"(b) In the event that a final order or judgment of injunction to be entered in favor of such officer of the county, city or town and against the person, firm or corporation sought to be enjoined, such final order of judgment shall contain a provision directing the person, firm or corporation to surrender to the sheriff or any other law enforcement agency of the county in which the action was brought any of the matter described in paragraph (1) hereof and such sheriff or law enforcement agency shall be directed to seize and destroy the same or to hold the same as evidence."

First, the statutes, as interpreted today, contravene the First Amendment because they chill protected expression. As I have explained in detail elsewhere, the concept of obscenity is an inherently vague one, and no legislative or judicial efforts that even arguably comport with the First Amendment could define the term with sufficient precision to enable businesspersons confidently to determine whether their products or exhibitions would be ruled obscene. (*Bloom* v. *Municipal Court* (1976) 16 Cal.3d 71 [127 Cal.Rptr. 317, 545 P.2d 229] (Tobriner, J., dissenting).) The problem of defining obscenity is intractable because we have no community view of that which appeals to the prurient interest and lacks social value, but rather a host of distinct views within each community. And even if these distinct views could be said metaphysically to coalesce to form some community standard, no trier of fact could confidently ascertain what that standard was.

The determination that an exhibition is obscene, consequently, amounts to nothing more than a testament to subjective preferences or a conjecture about the taste and fancy of one's neighbors. As the Court of Appeal acknowledged in *In re Davis* (1966) 242 Cal.App.2d 645, 661 [51 Cal.Rptr. 702], when it held a law proscribing "any act which openly outrages public decency" impermissibly vague, "[t]he constitution . . . could not tolerate a law which would make an act a crime, or not, according to the moral sentiment which might happen to prevail with the judge and jury . . . ."

Although we do not deal here with a criminal law, the vice of vagueness remains fatal. The United States Supreme Court explained: "Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech and of the press suffer." (*Ashton* v. *Kentucky* (1966) 384 U.S. 195, 200 [16 L.Ed.2d 469, 473, 86 S.Ct. 1407].)

Moreover, the vagueness and subjectivity of present obscenity doctrine impose particularly severe burdens on freedom of expression if, as the majority holds, obscenity doctrine may be imported into public nuisance proceedings. In *Bloom* v. *Municipal Court, supra,* 16 Cal.3d 71 [127 Cal.Rptr. 317, 545 P.2d 229], a majority of this court incorporated into the definition of obscenity in section 311 of the Penal Code the guidelines set forth in *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]. Central to the *Miller* test is whether "the average

person, applying contemporary community standards" would find that the involved expression appeals to the prurient interest. If this constitutional "test" can be consistently applied at all, and I have already expressed my serious doubts that it can, it seems clear that a jury, as a microcosm of the community, is the only "trier of fact" fit to conduct the inquiry contemplated by *Miller.*

In a public nuisance proceeding, however, no jury is impanelled to determine whether a particular work is obscene under contemporary community standards; that crucial determination—upon which the censorship of a book, a magazine, a play or a motion picture turns—is left instead to a single judicial officer. In a criminal obscenity proceeding, the requirement that a jury be drawn from a cross-section of the community will normally provide at least some promise that the varying tastes and sensibilities that exist in every community will play some role in the determination of whether a work is obscene or not. By authorizing a single judge—distant to the interplay of the diverse cultural, religious, intellectual and economic backgrounds commonly present in a jury room—to make the determination of obscenity on the basis of an undeniably subjective standard, the majority inevitably confines constitutional protection only to those works that, in the personal view of a single judge, are not offensive.[6]

Nearly 20 years ago, in *Butler* v. *Michigan* (1957) 352 U.S. 380 [1 L.Ed.2d 412, 77 S.Ct. 524], the United States Supreme Court overturned a state obscenity statute that prohibited the dissemination of any book that the state believed was unfit for children. Justice Frankfurter, writing for a unanimous court, declared: "The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely this is to burn the house to roast the pig. . . . The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children." (352 U.S. at p. 383 [1 L.Ed.2d at p. 414].)

---

[6]Although a trial court's determination of obscenity is subject to appellate review, numerous commentators have pointed out that in light of the subjective nature of the *Miller* standards, "[d]irect appellate review of findings of prurient appeal and patent offensiveness becomes impossible." (Note, *Community Standards, Class Actions and Obscenity Under Miller v. California* (1975) 88 Harv.L.Rev. 1838, 1844; see, e.g., Hunsaker, *The 1973 Obscenity-Pornography Decisions: Analysis, Impact and Legislative Alternatives* (1974) 11 San Diego L.Rev. 906, 931, fn. 124; *The Supreme Court, 1972 Term* (1973) 87 Harv.L.Rev. 1, 168-169.)

In like manner, the "incidence" of the decision of the majority in this case is to reduce the adult population of California to reading only those books that do not offend the sensibilities of the most "sensitive" trial judge in their community. Surely such a procedure robs free speech of the stringent protection guaranteed by our most cherished constitutional precepts.[7]

In sum, California's public nuisance statutes simply were not drafted for the purpose to which the majority commits them. The sword of public nuisance is a blunt one, admirably designed to curb noxious odors or to quell riots, but ill suited to the delicate sphere of the First Amendment where legal overkill is fatal.

Because the public nuisance statutes do not govern the willful viewing of obscene material in private by adults—and because if they did they would be constitutionally defective—I conclude that the trial court properly sustained the defendant's demurrer. Accordingly, I would affirm the decision below.

Mosk, J., concurred.

---

[7]The majority circumvents another constitutional problem inherent in its approach by importing to the public nuisance statutes a requirement of a prior adversary hearing. The majority justifies this judicial rewriting of the statute by referring to the principle that laws should be construed so as to uphold their validity. There is, however, an alternative way to construe the statutes involved in this case so as to render them immune to constitutional attack: they can be interpreted as inapplicable to private behavior. Given that the applicability of the statute's language to private behavior is, at best, highly dubious, *this* reading would seem the more judicious way to construe the statute so as to uphold its validity.